RECEIVED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

IN RE: APPLICATION OF THE UNITED
STATES OF AMERICA FOR ORDER
PURSUANT TO 18 U.S.C. § 2703(d)

**UNDER SEAL**

Case No. 1:19-ec-1275

## WARNER MEDIA'S OBJECTIONS TO AND APPEAL FROM
## MAGISTRATE JUDGE'S DENIAL OF MOTION TO QUASH
## <u>OR MODIFY ORDER ISSUED PURSUANT TO 18 U.S.C. § 2703(d)</u>

Warner Media, LLC respectfully objects to and appeals from Magistrate Judge

Buchanan's October 26, 2020 order in this matter, which denied Warner Media's motion to

quash or modify an order of July 15, 2020, issued pursuant to 18 U.S.C. § 2703(d). As a

consequence of the October 26 Order—in which Judge Buchanan reversed her prior decision

quashing the July 15 Order—Warner Media is required to produce to the government

information concerning *all* emails that a veteran national security reporter working for CNN sent

or received during a two-month period. That order captures more than 34,000

communications—including 26,000 communications wholly internal to CNN or Warner

Media—during a period in which the reporter published more than 50 news stories on a broad

array of topics.

Neither the First Amendment nor Section 2703 permits this kind of wide-ranging

intrusion into the inner workings of a newsroom. Indeed, Judge Buchanan recognized the

overbroad nature of the July 15 Order when she initially granted Warner Media's motion to

quash and directed the government to propose a narrower approach that would be less invasive.

As Judge Buchanan observed, many of the emails that fall within the July 15 Order likely have no connection to the government's investigation.

The First Amendment prohibits the government from compelling the production of records concerning core constitutionally protected activities that are unrelated to the government's investigation. Even if news organizations have no blanket privilege to refuse to comply with such compulsory process, both the Supreme Court and the Fourth Circuit have made clear that courts must carefully examine such proposed government intrusions into the newsgathering process to ensure that First Amendment rights are treated with sensitivity. Here, compelling disclosure of the information covered by the July 15 Order would give the government significant intelligence about the reporter's and CNN's newsgathering activities during that two-month period (including the identity of every news source that the reporter contacted by email), as well as a bird's-eye view of the inner workings and deliberations of a large news organization. That information lies at the heart of the First Amendment's protections. The July 15 Order should be quashed or narrowed to avoid any unnecessary intrusion into those protected activities.

Section 2703(d) likewise requires that such government demands for information, and any order compelling the production of that information, be tailored to obtain relevant and material information—not demonstrably irrelevant and immaterial information. Here, Warner Media has established that the July 15 Order captures wide swaths of information that have no plausible connection to the government's investigation. The government never contested that point; nor did Judge Buchanan. The First Amendment interests implicated by the July 15 Order only heighten these concerns.

2

As a consequence of the government's refusal to tailor its request to information that is relevant and material to its investigation, the July 15 Order reaches tens of thousands of records relating to newsgathering and reporting activities that are not relevant to the government's investigation. Rather than abide by the requirements of § 2703(d) and the First Amendment, the government seeks to use the order as an opportunity to gather intelligence about the inner workings of a major news organization. The order cannot be squared with the First Amendment or § 2703(d) and imposes an undue burden on Warner Media, and therefore should be quashed or narrowed.

## STATUTORY FRAMEWORK

To obtain non-content records pertaining to stored electronic communications, the government must secure either a warrant pursuant to Federal Rule of Criminal Procedure 41 or a court order under 18 U.S.C. § 2703(c), (d). *See In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 287 (4th Cir. 2013). Courts may grant a government's records request under § 2703(d) only if the government "offers specific and articulable facts showing that there are reasonable grounds to believe that … the records or other information sought[] are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Even if a government request is initially deemed to have satisfied those statutory requirements, courts "may quash or modify" a § 2703(d) order "if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider." *Id.* "Undue burden" encompasses, among other things, "situations where the subpoena seeks information irrelevant to the case." *Cook v. Howard*, 484 F. App'x 805, 812 n.7 (4th Cir. 2012). First Amendment interests "heighten[] the concern about burdensomeness." *In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1296 (4th Cir. 1987).

## BACKGROUND

On July 17, 2020, Warner Media was served with an order issued under 18 U.S.C.

§ 2703(d) by United States Magistrate Judge Ivan D. Davis dated July 15, 2020, requiring

Warner Media to produce records and other information related to the email account

"Barbara.starr@turner.com" (the "Account") for the period "between June 1, 2017 to July 31,

2017." *See* Ex. A ("July 15 Order").[1]  That account belongs to Barbara Starr, a veteran national

security and defense reporter currently employed by CNN, a subsidiary of Warner Media. *See*

Ex. C, Decl. of Stephanie Abrutyn in Supp. of Mot. to Quash or Modify ("Abrutyn Decl.") ¶ 3.

The government has orally represented that Ms. Starr is not a target of the investigation.

The July 15 Order directs production of extensive information about the account,[2]

including user names, dates and times, and Internet protocol ("IP") addresses "for each

connection made to or from the Account," as well as "[i]nformation about each communication

sent or received by the Account," including dates and times, method of communication, and

source/destination information such as email addresses, IP addresses, and telephone numbers.

After receiving the July 15 Order, Warner Media diligently endeavored to identify responsive

records.  Abrutyn Decl. ¶ 4.[3]  Warner Media's efforts have revealed that the July 15 Order, as

---

[1]    All record materials in this case were previously submitted under seal to the Magistrate Judge.  Warner Media attaches key filings to this brief for ease of access.

[2]    Although the July 15 Order included subject headers as an item for production, the government stated in its opposition to the motion to quash that it is no longer seeking that information.

[3]    The July 15 Order initially required Warner Media to provide responsive records by July 25, 2020, ten days after the order's issuance.  The government agreed to a 30-day extension of that deadline, but refused to agree to a further extension unless Warner Media committed (1) to produce some materials by the August 25, 2020 deadline, or (2) to provide a concrete proposal regarding future productions.  Warner Media then filed a motion to extend the time to respond to the July 15 Order on August 24, 2020.  On August 27, 2020, Judge Buchanan extended the deadline to respond to the July 15 Order to September 11, 2020.

4

currently framed, would direct the disclosure of information related to 34,347 emails from Ms. Starr's account. *Id.* ¶ 6. More than 26,000 of the emails covered by the July 15 Order are purely internal within only CNN or Warner Media. *Id.* ¶ 7. Most, if not all, of that information is likely unrelated to the government's investigation. At the same time, much of it reflects the inner workings of CNN, a large news organization, including its editorial, deliberative, and newsgathering processes. In addition, thousands of the communications captured by the July 15 Order are with government or military email addresses that would bear directly on Ms. Starr's newsgathering activities by identifying all the news sources with whom she communicated by email during the two-month period, when she communicated with them, and the frequency of those communications. *Id.* ¶¶ 8-10.

During the two-month period covered by the July 15 Order, Ms. Starr published more than 50 news articles and appeared on television or radio in her professional capacity on more than 150 occasions. Abrutyn Decl. ¶ 9. Those articles and appearances covered an extraordinarily wide range of topics, including Syria, North Korea, Afghanistan, the U.S.S. Fitzgerald, politics and the military, Iran, Qatar, Russia, China, Libya, Navy SEALs, military preparedness, a Medal of Honor recipient, a military plane crash, and tornados. *See* Ex. I, Suppl. Decl. of Stephanie Abrutyn in Support of Opposition to Government's Motion for Reconsideration ("Suppl. Abrutyn Decl.") ¶ 7. [4]

On September 11, 2020, Warner Media filed a motion requesting that the Court quash the July 15 Order or narrow that order to compel the production of only information that is relevant

---

[4]    All of Ms. Starr's articles are attached to the Supplemental Declaration of Stephanie Abrutyn. *See* Ex. I at Ex. 1.

and material to the government's investigation.[5]  *See* Ex. B.  The government opposed that motion and submitted an *ex parte,* classified addendum to its submission.  *See* Ex. D.  Warner Media filed a reply brief on September 30, 2020.  *See* Ex. E.

At a hearing on October 7, 2020, Judge Buchanan expressed concerns about the breadth of the government's request and granted Warner Media's motion to quash the July 15 Order.  *See* Ex. F.  Judge Buchanan explained that the government had not sufficiently narrowed the request for records from Ms. Starr's account to obtain relevant records, and ordered the government to submit a proposal to narrow its request by October 14, 2020.[6]  *Id.*  By way of example, the court noted that the government could eliminate all internal communications from its request.

On October 9, 2020, instead of submitting a narrowed proposal, the government filed a motion asking Judge Buchanan to reconsider her October 7, 2020 decision, and again filed an *ex parte*, classified submission.  *See* Ex. G.  Warner Media opposed the government's motion for reconsideration.  *See* Ex. H.  On October 26, 2020, after a brief hearing, Judge Buchanan granted the government's motion for reconsideration and ordered Warner Media to comply with the July 15 Order by November 2, 2020.[7]  *See* Ex. K.  Judge Buchanan reaffirmed her preference that the government narrow its request for records; nonetheless, she concluded from the government's *ex parte* submission that "there is no good way to now narrow this further."  *See* Ex. J, Transcript of Motion Hearing ("Oct. 26, 2020 Hr'g Tr.") 7:18-19.  As to the "undue burden" caused by the

---

[5]     Prior to filing a motion to quash, Warner Media conferred with the government in an attempt to narrow the July 15 Order's expansive scope.  The government was unwilling to agree to any of the limitations proposed by Warner Media to address the July 15 Order's overbreadth and related First Amendment issues.

[6]     The court experienced a technical malfunction when trying to record the October 7 hearing.  As a result, there is no transcript of that proceeding.

[7]     On November 2, 2020, Judge Buchanan stayed her October 26, 2020 order for thirty days to allow Warner Media to appeal to this Court.  That stay expires on December 2, 2020.

July 15 Order's overbreadth, the Court stated only that the July 15 Order was not burdensome because these "noncontent" records were "something that an IT person can easily pull up." *Id.* at 8:1-3.

## LEGAL STANDARD

Magistrate judge decisions related to orders issued under 18 U.S.C. § 2703(d) fall under the catch-all provision of the Federal Magistrates Act, 28 U.S.C. § 636(b)(3), which authorizes magistrate judges to undertake "such additional duties as are not inconsistent with the Constitution and laws of the United States." *In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d 114, 124 (E.D. Va. 2011). Decisions under § 636(b)(3) "are accorded *de novo* review by the district court." *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d at 289.

## ARGUMENT

After initially agreeing with Warner Media, Judge Buchanan reversed her prior decision quashing the July 15 Order. That reversal was based on a mistaken application of the law and her incorrect conclusions that Warner Media's First Amendment interests are minimal because the order seeks non-content records, that the only burden on Warner Media was the logistical burden of pulling records, and that there is no way to narrow the government's order. Put simply, Judge Buchanan concluded that the government's asserted interest in protecting the secrecy of its investigation overrides the substantial First Amendment interests at stake. But those interests are not mutually exclusive and can be accommodated through a narrower order. And the First Amendment interests implicated by the July 15 Order need not and should not yield to the government's insistence on obtaining tens of thousands of records *unrelated* to its investigation.

The July 15 Order directs a news organization to produce to the government information related to every email communication that a veteran national security reporter sent or received during a two-month period, regardless of the counterparty to those communications, and irrespective of whether those emails are external (including those with potential sources) or internal (including those with editors and newsroom colleagues). The sweeping scope of the government's § 2703(d) request—which, unlike most § 2703(d) requests, is directed at a journalist's email account—targets core First Amendment protected activity. The order compels a news organization to produce records about tens of thousands of emails concerning newsgathering, reporting, and editing, even though many, if not most, of those records have no relation to the government's investigation. The July 15 Order also imposes an undue burden on Warner Media because it reaches wide swaths of information that is not "relevant and material" to the government's investigation—a burden that is exacerbated by the important First Amendment interests at stake. Accordingly, the Court should either quash the July 15 Order or narrow it so that it reaches only information that is relevant and material to the government's investigation.

## I.   THE FIRST AMENDMENT MANDATES THAT THE ORDER BE CAREFULLY TAILORED TO OBTAIN RELEVANT INFORMATION

The United States Constitution recognizes a paramount public interest in the maintenance of a vigorous and independent press capable of participating in robust, unfettered debate over controversial matters. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-271 (1964). As Justice Black explained, "[i]n the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy…. The press was protected so that it could bare the secrets of government and inform the people." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). Informed public

opinion, as the Supreme Court has recognized, "is the most potent of all restraints upon

misgovernment." *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936); *see also Cox*

*Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975) ("Without the information provided by

the press most of us and many of our representatives would be unable to vote intelligently or to

register opinions on the administration of government generally."). It is beyond dispute that the

July 15 Order reaches information subject to core First Amendment protections. As a result, the

First Amendment requires that the July 15 Order be carefully tailored to avoid unnecessarily

intruding on those important interests.

### A.     The July 15 Order Implicates Important First Amendment Interests Related To The Disclosure Of News Sources And CNN's Editorial Processes

The First Amendment protects both the identity of news sources and the editorial

processes of news organizations—both of which are at issue under the July 15 Order. The

Fourth Circuit has recognized that "[n]ews reporters are 'entitled to some constitutional

protection of the confidentiality of [their] sources'" because those "protection[s] [are] necessary

to ensure a free and vital press, without which an open and democratic society would be

impossible to maintain." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000). The

routine production of records revealing news sources, the court explained, would restrain "the

free flow of newsworthy information," "and the public's understanding of important issues and

events would be hampered in ways inconsistent with a healthy republic." *Id.*[8]

---

[8]     Similarly, the Third Circuit has recognized that "[t]he interrelationship between
newsgathering, news dissemination and the need for a journalist to protect his or her source is
too apparent to require belaboring." *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979).
*See also Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 35 (2d Cir. 1999) (noting "'the
important interests of reporters and the public in preserving the confidentiality of journalists'
sources'"); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1181 (1st Cir. 1988)
(observing that the "disclosure of [confidential sources or information] would clearly jeopardize
the ability of journalists and the media to gather information and, therefore, have a chilling effect
on speech"); *Zerilli v. Smith*, 656 F.2d 705, 710-711 (D.C. Cir. 1981) (noting that "news

To ensure that the public will enjoy the benefits of informed public debate, the First Amendment also protects the press from unwarranted governmental intrusion into a news organization's deliberating, editing, and publishing processes. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254, 256 (1974). Those protections apply with particular force to "the exercise of editorial control and judgment," which includes "[t]he choice of material to go into a newspaper ... and treatment of public issues and public officials—whether fair or unfair." *Id.* at 258. As Justice White explained in *Tornillo*, "[w]e have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers," "and remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." *Id.* at 259 (White, J., concurring). The Fourth Circuit has similarly explained that the First Amendment "protect[s] a news outlet's editorial perspective or the way its beat reporters cover" a potential story; in other words, "the very 'choice of material to go into a newspaper' garners independent constitutional protection." *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Tornillo*, 418 U.S. at 258).

The July 15 Order implicates both of those First Amendment protections. Judge Buchanan, however, failed to give due weight to those important First Amendment interests. Instead, she suggested that the order's impact on First Amendment activities was limited because the July 15 Order compels only the production of non-content information. *See* Oct. 26, 2020

---

gathering is essential to a free press" and that "the press' function as a vital source of information is weakened wherever the ability of journalists to gather news is impaired"); *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972) (noting the "[c]ompelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis" and "[t]he deterrent effect such disclosure is likely to have upon future 'undercover' investigative reporting ... threatens freedom of the press").

Hr'g Tr. 7:25-8:1 (dismissing Warner Media's First Amendment concerns because "this is noncontent material"). But the fact that records are "non-content" does not eliminate the need to consider First Amendment concerns; indeed, here, the non-content information required to be produced under the July 15 Order discloses substantial information about Ms. Starr's and CNN's newsgathering and reporting activities.

First, the July 15 Order compels Warner Media to disclose the identity of every news source with whom Ms. Starr communicated by email during a two-month period, including when and how often they communicated. *See* Suppl. Abrutyn Decl. ¶ 9; Abrutyn Decl. ¶¶ 7-8 (noting that Ms. Starr participated in approximately 7,800 communications with external email accounts, many of which relate to newsgathering activities). That information—which, at a minimum, relates to more than 50 news stories and 150 television or radio appearances, *see* Suppl. Abrutyn Decl. ¶¶ 7-8—would give the government significant access to information about the newsgathering activities of a reporter whose beat focuses on the government itself. Revealing sources would have a profound impact on newsgathering activities, ultimately making it more difficult for reporters to obtain newsworthy information from individuals. Sources will be less willing to communicate with reporters if they know that an entire list of a reporter's sources has been disclosed to the government. *See, e.g.*, *Ashcraft*, 218 F.3d at 287. That effect would be particularly strong in the context of reporting about the government, military, or national security.

Second, the July 15 Order compels Warner Media to disclose information related to more than 26,000 purely internal communications, communications that would provide a roadmap to CNN's editorial processes and internal decision-making—issues well beyond anything part of the government's investigation. Suppl. Abrutyn Decl. ¶¶ 4, 10. A bird's-eye view of the

information flow within a newsroom—the identity of every editor, analyst, or reporter communicating with a high-profile national reporter, along with the date and time of those communications—would provide the government with valuable intelligence about the newsroom's priorities, plans, and strategy. The government could take the publication date and time of every article or television appearance during that two-month period and work backwards to map communications that likely relate, or it could take an email to or from a particular source to map Ms. Starr's communications going forward. *Id.* ¶ 10. Disclosing information related to every internal CNN and Warner Media email communication would also provide the government with a roadmap of CNN's internal deliberations, including the editors, reporters, and other staff involved in communications and internal decision-making is an area at the core of the First Amendment.

Moreover, CNN and other Warner Media subsidiaries often use internal distribution email lists that identify the topic being discussed. *Id.* ¶ 11. Approximately 10,000 emails covered by the July 15 Order appear to relate to internal distribution lists within CNN or Warner Media, many of which reflect the content or subject matter of the communications in the distribution list alias itself. *Id.* Those records—which closely resemble subject headers often found to constitute "content" under the Stored Communications Act—would provide the government with even greater insight into CNN's internal deliberations.

**B.** **The First Amendment Protects Against Government Attempts To Obtain Information Unrelated To An Ongoing Investigation**

The First Amendment requires that government demands for information directed at news organizations be carefully tailored to avoid unnecessary intrusion onto core protected activity. In *Branzburg v. Hayes*, 408 U.S. 665 (1972), the Supreme Court recognized that, even in the criminal setting, journalists' newsgathering activities do not lack First Amendment

protection and must be treated with sensitivity.  Although the Court held in *Branzburg* that reporters do not have a blanket privilege that excuses them from complying with grand jury subpoenas to testify, *see id.* at 690-691, it recognized that First Amendment concerns would be implicated if a subpoena (or other compulsory process) were issued to a reporter seeking documents unrelated to a legitimate government investigation.  That concern was not presented in *Branzburg*, however, because "[n]othing in the record indicate[d] that these grand juries were 'probing at will and without relation to existing need.'"  *Id.* at 700 (alteration omitted).[9]

Justice Powell's concurring opinion in *Branzburg* similarly recognized that the First Amendment imposes constraints on the use of compulsory process to obtain information from reporters, explaining that

> if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered.

408 U.S. at 710 (Powell, J., concurring).  In circumstances where many of the requested materials appear to have no relation to the government's investigation, a reporter's opposition to compulsory process "should be judged on its facts [on a case-by-case basis] by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct."  *Id.*

---

[9]     Warner Media is not asserting a blanket privilege that would allow it to refuse to produce any records in response to the July 15 Order.  Nor is Warner Media arguing that *no* information sought by the July 15 Order could be relevant and material to the government's investigation, as required by § 2703(d).  Instead, Warner Media argues that the July 15 Order is overbroad because it compels the production of information about tens of thousands of communications that have nothing to do with the government's investigation given the wide array of topics Ms. Starr covered in her reporting (seemingly the whole world).

The Fourth Circuit has similarly made clear that First Amendment interests must be protected from overbroad document requests that encompass materials unrelated to an underlying investigation. In *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013), the Fourth Circuit confirmed that courts must consider reporters' First Amendment interests when a subpoena is not "based on a legitimate need of law enforcement." *Id.* at 496. Although the court split from several other circuits and held that, in the criminal context, reporters do not have a privilege to refuse to comply with subpoenas seeking specific and indisputably relevant trial testimony about their sources, *see id.* at 495,[10] it did not broadly hold that the process of newsgathering lacks all First Amendment protection. Nor did it authorize a general rummaging by the government into a reporter's communications—be they with sources, editors, or others— without regard to whether those communications were relevant to the government's investigation.[11]

---

[10]   The Second, Third, and Eleventh Circuits, by contrast, have recognized a qualified reporter's privilege in criminal cases. *See United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *United States v. Treacy*, 639 F.3d 32, 42-43 (2d Cir. 2011); *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980); *see also United States v. Foote*, No. 00-CR-20091-01-KHV, 2002 WL 1822407, at *1 (D. Kan. Aug. 8, 2002) (recognizing reporter's privilege in a criminal case).

[11]   For several reasons, *Sterling*'s narrow holding does not dictate the result of this motion. First, *Sterling* did not address the standards for § 2703(d) orders—which can be exceptionally broad and, as shown in this case, can call for tens of thousands of records—or the extent to which the First Amendment imposes limits on those orders. It addressed only whether a reporter could be compelled to testify narrowly about his confidential sources (in that case, likely a single source) at a criminal trial. 724 F.3d at 490. Second, there was no indication in *Sterling* that the reporter was being compelled to testify about confidential sources without a legitimate law enforcement need—the government only sought to compel the reporter to testify about his source related to a specific piece of information, the disclosure of which formed the basis for the criminal charges at issue in the trial. *See id.* at 490, 498-499. Third, the court held that even if there were a qualified reporter's privilege, the government has satisfied its burden to overcome that privilege. *See id.* at 505-510. In particular, the court explained that "[t]here [was] no dispute that the information sought from [the reporter was] relevant." *Id.* at 505. The government cannot make that showing here—that *all* of the information sought by the § 2703(d)

Indeed, in other decisions, the Fourth Circuit has emphasized that the First Amendment imposes limits on compulsory process in the criminal context, stressing that a district court was correct to ensure that "subpoenas were properly 'tailored' and that the documents [sought] were relevant." *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992). The court explained that such tailoring was necessary under *Branzburg* to "balance the possible constitutional infringement and the government's need for documents when it rules on the motion to quash." *Id.* The Fourth Circuit also emphasized that it was "not prepared to rubber-stamp every subpoena" that might interfere with protected "expressive activities." *Id.* It instead "caution[ed] district courts to apply with special sensitivity, where [First Amendment interests] are potentially implicated, the traditional rule that '[prosecutors] are not licensed to engage in arbitrary fishing expeditions.'" *Id.*[12]

In sum, the First Amendment mandates that a government request for information must be carefully tailored to obtain only those documents that are likely to be relevant to the government's investigation. Absent such tailoring, an overbroad order should be quashed.

---

order, information relating to tens of thousands of emails over a two-month period, is relevant to a legitimate criminal investigation.

[12] *See also In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1296, 1299 (4th Cir. 1987) (recognizing that First Amendment interests "heighten[] the concern about burdensomeness" when analyzing the breadth of a criminal subpoena, and cautioning that "a court must not give short shrift to the party asserting private constitutional rights"); *Ealy v. Littlejohn*, 569 F.2d 219, 227 (5th Cir. 1978) (recognizing "that the First Amendment can serve as a limitation on the power of the grand jury to interfere with a witness' freedoms of association and expression" and that "courts are not powerless to act" when the government "goes on a fishing expedition in forbidden waters"); *Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842, 2008 WL 4104347, at *10 (E.D. Mich. Aug. 28, 2008) (recognizing that even where "First Amendment interests are not a complete bar to disclosure," "the potential adverse effects on news gathering activities, posed by an order compelling disclosure of a confidential source, suggests that an order to disclose should be as narrow as possible").

II.    **SECTION 2703(D) LIKEWISE IMPOSES ESSENTIAL RELEVANCE REQUIREMENTS, WHICH MUST BE APPLIED WITH HEIGHTENED SENSITIVITY BECAUSE OF THE FIRST AMENDMENT INTERESTS AT STAKE**

A.    **An Order That Does Not Meet Section 2703(d)'s Relevance Requirements Should Be Quashed**

Section 2703(d) imposes several constraints on the compelled production of information unrelated to a government's investigation—constraints that are heightened where, as here, that information implicates core First Amendment activity. Judge Buchanan did not properly apply those limitations. First, a court may quash or modify a § 2703(d) order if "compliance with such order otherwise would cause an undue burden." 18 U.S.C. § 2703(d). As the Fourth Circuit has recognized, "undue burden" "encompasses situations where the subpoena seeks information irrelevant to the case." *Cook*, 484 F. App'x at 812 n.7.[13] Accordingly, in *In re Subpoena Duces Tecum to AOL*, the court found that a subpoena issued to AOL imposed an undue burden even though it was limited to a six-week period because it sought emails unrelated to the litigation. *See* 550 F. Supp. 2d at 612. The court concluded that the "subpoena must be quashed because it imposes an undue burden" by "requesting 'all' of [an individual's] e-mails for a six-week period" and "d[id] not limit the emails requested to those containing subject matter relevant to the underlying action or sent to or from employees connected to the litigation." *Id.*

Second, § 2703(d) authorizes a court to order disclosure of information "only if the governmental entity offers specific and articulable facts showing that there are reasonable

---

[13]    *See also Singletary v. Sterling Transp. Co., Inc.*, 289 F.R.D. 237, 241 (E.D. Va. 2012) (recognizing that "undue burden" "'encompasses situations where the subpoena seeks information irrelevant to the case'" and that "'[a] subpoena imposes an undue burden on a party when [it] is overbroad'" (alterations in original)); *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008) (upholding magistrate judge's order quashing subpoena where the subpoena was "overbroad to the extent that it d[id] not limit the documents requested to subject matter relevant to the claims or defenses" in the case and therefore "impose[d] an undue burden").

grounds to believe that ... the records or other information sought[] are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Relevance is thus a key factor in determining whether a § 2703(d) order has a permissible scope. In the subpoena context, for example, the Fourth Circuit explicitly rejected the argument that "'relevance' to the underlying claims ... [wa]s not a proper basis to quash a subpoena" and that the subpoenaed party therefore lacked "standing" to challenge the subpoena. *Cook*, 484 F. App'x at 812. Relevance, the court explained, is a threshold requirement for obtaining a subpoena that remains germane and subject to challenge even if it is not separately listed as grounds for obtaining relief. *Id.* The same is true here; relevance and materiality are threshold requirements under § 2703(d), and those requirements do not dissipate after an order is issued.

Although the government has argued that the role of relevance under § 2703(d) is exhausted once it demonstrates to a court, *ex parte* and without any information about the scope of the records that are actually captured by the order, that the records sought are "relevant and material" to an ongoing investigation, *see* Ex. D at 4, that reading of § 2703(d) is by no means compelled by its text. Moreover, in a situation like this one, where the order is directed at core First Amendment activity of a journalist and a newsroom, serious constitutional questions would arise if a news organization could not argue that a § 2703(d) order was overbroad because it reached demonstrably irrelevant and immaterial information.[14] To the contrary, the relevance requirement does not end once the court enters a § 2703(d) order, and a § 2703(d) order may not ultimately compel the production of records that are unrelated to the government's investigation,

---

[14] For the same reason, whatever overbreadth might be tolerated in an ordinary case in order for the government to see the context of relevant information, that overbreadth must yield (and is not permitted) where it reaches First Amendment activity that is not at issue in the government's investigation. *See In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d at 130; *infra* Part II.B.

even if the order's overbreadth only comes to light after it is issued.[15]

In sum, § 2703(d) provides that an order may be issued only if "there are reasonable grounds to believe that ... the records or other information sought[] are relevant and material to an ongoing criminal investigation." And a service provider may move to "quash or modify" a § 2703(d) order if compliance "would cause an undue burden." Both the threshold requirement that the records sought must be relevant and material to the government's investigation and the court's authority to quash or modify orders that would cause an undue burden prohibit the compelled production of irrelevant records in response to overbroad government record requests and § 2703(d) orders.

**B.  The First Amendment Requires That § 2703(d) Orders Targeting Newsgathering And Reporting Activities Be Carefully Tailored To Obtain Relevant Information**

The First Amendment concerns present here sharpen the undue burden analysis required under § 2703(d). The Fourth Circuit has recognized that First Amendment interests can and should be considered in deciding whether an order imposes an undue burden or satisfies relevance requirements. For example, the court held that First Amendment interests "heighten[] the concern about burdensomeness" when analyzing the breadth of a grand jury subpoena, and cautioned that "a court must not give short shrift to the party asserting private constitutional rights." *In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d at 1296, 1299. The Fourth Circuit likewise recognized that courts must "apply with special sensitivity" the relevance requirement and "the traditional rule" prohibiting "fishing expeditions" when First Amendment

---

[15]    Although it may well be the case that neither the government nor Judge Davis knew it at the time, the government now knows that the July 15 Order reaches tens of thousands of records relating to newsgathering and reporting activities that are likely *not* relevant. With this knowledge, the government's overbroad request must be narrowed to obtain only those records that are relevant and material.

interests are implicated. *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d at 234; *cf.*

*Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978) (noting that courts must "apply the warrant

requirements with particular exactitude when First Amendment interests would be endangered

by the search").[16] Even absent constitutional considerations, courts recognize that assessing

undue burden involves "balanc[ing] 'the need for discovery against the burden imposed on the

person ordered to produce documents.'" *Virginia Dep't of Corr. v. Jordan*, No. 3:17mc02, 2017

WL 5075252, at * 19 (E.D. Va. Nov. 3, 2017), *aff'd*, 921 F.3d 180 (4th Cir. 2019).  That analysis

considers whether producing the information sought would "impede [the producing party's]

significant interest[s]." *Id.*  Here, Warner Media seeks to minimize the burden on its significant

First Amendment interests, which include the disclosure of news sources and intrusions into its

editorial processes, by ensuring that the July 15 Order is carefully tailored to obtain only relevant

information.

  The Department of Justice's own regulations also recognize that additional scrutiny is

required before using compulsory process on a reporter, as here.  Those regulations start with the

---

[16] Other courts have similarly recognized that compulsory process seeking information that
raises First Amendment concerns deserves careful scrutiny. *See Cusumano v. Microsoft Corp.*,
162 F.3d 708, 714 (1st Cir. 1998) (recognizing that "[c]ourts afford journalists a measure of
protection from discovery initiatives in order not to undermine their ability to gather and
disseminate information," and that "to withhold such protection would invite a 'chilling effect on
speech,' and thus destabilize the First Amendment" (citation omitted)); *United States v. Burke*,
700 F.2d 70, 76-77 (2d Cir. 1983) (holding that, "to protect the important interests of reporters
and the public in preserving the confidentiality of journalists' sources," courts must weigh "the
First Amendment interests of reporter[s]"); *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d
Cir. 1980) (holding that First Amendment interests should be considered in criminal cases
because compulsory process directed at reporters "can constitute a significant intrusion into the
newsgathering and editorial processes" and "may substantially undercut the public policy
favoring the free flow of information to the public"); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d
433, 438 (10th Cir. 1977) ("[I]t has to be concluded that compulsory disclosure in the course of a
'fishing expedition' is ruled out in the First Amendment case."); *Farr v. Pitchess*, 522 F.2d 464,
469 (9th Cir. 1975) (acknowledging that courts should balance "the protection afforded [a
reporter] by the First Amendment and the necessity that the newsman's source be revealed").

premise that a § 2703(d) order directed at members of the news media is an "extraordinary measure[]" that should not be undertaken lightly. 28 C.F.R. § 50.10(a)(3). By DOJ regulation, the information sought must be "essential to [a] successful investigation"; court process should not be used to obtain information that is "peripheral" or "nonessential" to the investigation. *Id.* § 50.10(c)(5)(ii)(A). Instead, any subpoena (or similar request) must be "narrowly drawn," be "directed at material and relevant information regarding a limited subject matter," and "avoid requiring production of a large volume of material." *Id.* § 50.10(c)(5)(vii). Here, the July 15 Order is not "narrowly drawn" to only obtain "essential" information that is "material and relevant ... [to] a limited subject matter," nor does it avoid the production of a large volume of material. To the contrary, the order would force Warner Media to produce information for over 34,000 emails that are mostly, and perhaps entirely, irrelevant, peripheral, and nonessential to the government's investigation.

The Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, further underscores the important interests at stake and the need to carefully tailor compulsory process aimed at newsgathering activities. The PPA prohibits the government from "search[ing] for or seiz[ing] documentary materials" or work product "possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication," unless there is probable cause to believe that person "has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(a), (b).

That provision was enacted to overturn the Supreme Court's decision in *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), and thereby prevent needless exposure of information protected by the First Amendment that is not at issue in a government investigation. There, the Court held that the Fourth Amendment permits unannounced searches of a newsroom for

evidence that might incriminate a third party as long as the government obtains a warrant. *Id.* at 553-560, 567. The dissent expressed concern that broad searches of reporters' newsgathering materials pursuant to a warrant—whereby the government would be allowed "to ransack the files of a newspaper, reading each and every document until they have found the one named in the warrant"—would "lead to the needless exposure of confidential information completely unrelated to the purpose of the investigation." *Id.* at 573 (Stewart, J., dissenting). Such searches are "inimical to the First Amendment," because they are "bound to have a deterrent effect on the availability of confidential news sources," "diminishing [the] flow of potentially important information to the public." *Id.* The dissent would have required, instead, that the government proceed through narrowly tailored subpoenas, which "would permit the newspaper itself to produce only the specific documents requested," thereby preventing the disclosure of news sources unrelated to the government's investigation. *Id.* Congress passed the PPA to prevent the First Amendment intrusions that *Stanford Daily* otherwise would have condoned. *See* S. Rep. 96-874, at 4-5, 9 (1980).

A Western District of Wisconsin decision is illustrative of the approach that is warranted here. In *In re Grand Jury Subpoena to Amazon.com Dated Aug. 7, 2006*, 246 F.R.D. 570 (W.D. Wis. 2007), the court narrowed a grand jury subpoena issued to Amazon seeking information about used book buyers in response to First Amendment concerns. *Id.* at 573. The court explained that "it is an unsettling and un-American scenario to envision federal agents nosing through the reading lists of law-abiding citizens while hunting for evidence against somebody else." *Id.* The court also noted that permitting the subpoena would have a chilling effect on e-commerce and other protected activities. *Id.* Accordingly, the court both imposed limits and mandated review procedures that lessened the subpoena's impact on the book sellers' and

customers' First Amendment rights. *Id.* (ordering the use of a "filtering mechanism" and other measures to limit the number of Amazon customers impacted); *cf. United States v. Comley*, 890 F.2d 539, 545 (1st Cir. 1989) (rejecting First Amendment challenge to subpoena because of "narrowness with which the subpoena ... is drawn," specifically, it was not "a blanket request for the identities of all of Comley's associates and informants" but instead sought only "tape recordings of a limited number of conversations that took place between two specified individuals"). Imposing substantive limits on the July 15 Order would ease the First Amendment concerns implicated by the current order's broad sweep.

### III.   THE JULY 15 ORDER IS NOT SUFFICIENTLY TAILORED TO OBTAIN RELEVANT INFORMATION AS REQUIRED BY THE FIRST AMENDMENT AND § 2703(D)

Given the volume of communications covered by the July 15 Order, the categories of counterparties involved, and the wide array of topics covered by Ms. Starr's reporting, it is obvious that much, if not most, of the information sought could not be relevant and material to the government's investigation. During the two-month period covered by the July Order, Ms. Starr sent or received more than 34,000 emails, including more than 26,000 internal CNN and Warner Media communications, thousands of emails sent to or from email domains owned and controlled by the U.S. government, and numerous personal or commercial communications. *See* Abrutyn Decl. ¶¶ 6-8, 10; Suppl. Abrutyn Decl. ¶¶ 4-5. Enforcing the July 15 Order as drafted would compel Warner Media to produce information about every single one of those communications, including emails with Ms. Starr's news sources as well as editors, reporters, and others within CNN and Warner Media. *See* Abrutyn Decl. ¶¶ 6-8; Suppl. Abrutyn Decl. ¶¶ 9-10. Moreover, the majority of those communications appear to relate to Ms. Starr's newsgathering and reporting activities, *see* Abrutyn Decl. ¶ 7; Suppl. Abrutyn Decl. ¶ 6, including the more than 50 articles Ms. Starr published during the two-month period covered by

the July 15 Order and her more than 150 professional appearances on television or radio during those two months, *see* Abrutyn Decl. ¶ 9; Suppl. Abrutyn Decl. ¶¶ 7-8. Those articles and appearances covered an extraordinarily wide range of topics, including Syria, North Korea, Afghanistan, the U.S.S. Fitzgerald, politics and the military, Iran, Qatar, Russia, China, Libya, Navy SEALs, military preparedness, a Medal of Honor recipient, a military plane crash, and tornados. *See* Suppl. Abrutyn Decl. ¶ 7.

The government has refused to tailor its request to obtain information likely to be relevant. It has instead maintained its right to obtain information about *every* email Ms. Starr sent or received during a two-month period (and by extension, information related to *every* story that Ms. Starr was working on during that time), regardless of the fact that the request reaches tens of thousands of a reporter's communications that are not at issue in its investigation. Permitting the government to obtain those records without undertaking some effort to tailor its request to information that is relevant to the government's investigation would sanction an invasive and impermissible fishing expedition into newsgathering activities that are largely, if not completely, unrelated to the government's investigation. Because the July 15 Order compels the production of information that is irrelevant to the government's investigation, it is impermissibly overbroad and imposes an undue burden on Warner Media.

Even absent First Amendment concerns, other courts have refused similarly overbroad government requests to compel the production of information when it was clear that the information sought was unrelated to the underlying investigation. The District Court for the District of Columbia, for example, found that a government request under § 2703(d) for 120 days' and 7 days' worth of non-content information from separate accounts was "not sufficiently tailored to be actually 'relevant and material' to [an] investigation" because the government only

"alleg[ed] that an individual may have been involved in a specific crime on a specific date and at a specific time." *In re Application of United States for an Order Authorizing Disclosure of Historical Cell Site Info. for Tel. No.*, 20 F. Supp. 3d 67, 74 (D.D.C. 2013). That the government was investigating a series of crimes that occurred over two months did not justify the broad request without a "specific explanation" for why the government needed information from the requested period. *Id.* at 72. The court explained that "each individual 'record[] or other information' [sought] must be 'relevant and material' to the investigation; otherwise, the government could obtain an entire database of ... information merely because one or some of the entries in that database are 'relevant and material.'" *Id.* The July 15 Order similarly fails to satisfy the § 2703(d) relevance requirements because it compels the production of information related to thousands of emails that almost certainly have no relationship to the government's investigation.

Moreover, even if the general § 2703(d) relevance standards are satisfied here, the July 15 Order nonetheless fails to satisfy the undue-burden requirement given the important First Amendment interests at stake. By serving an expansive § 2703(d) order on a media account, the government would gain substantial intelligence into a newsroom's plans, priorities, and strategy in numerous areas that are not part of its investigation. The wide-ranging record request would allow the government to sift through all of a reporter's email headers from a two-month period, deciding after the fact what information is relevant to its investigation. That information lies at the heart of the First Amendment's protections. Those important First Amendment interests must be considered in deciding whether the July 15 Order should be quashed or modified.

Judge Buchanan's decision ordering Warner Media to comply with the July 15 Order— issued after she had previously expressed concerns about the breadth of the July 15 Order and

determined that it had to be narrowed[17]—did not apply the proper relevance inquiry or the appropriate undue burden analysis, especially as informed by the First Amendment. Judge Buchanan did *not* conclude that the July 15 Order reached only records that were relevant and material; indeed, she reiterated that a narrower order would be preferable, but nonetheless concluded that "there is no good way to now narrow this further." Oct. 26, 2020 Hr'g Tr. 7:18-19. Judge Buchanan thus allowed the government to abandon any effort to narrow the July 15 Order, even while recognizing that the order reaches records that are *not* relevant and material to the government's investigation. That decision does not give proper heed to the relevance requirements imposed by the statute, the undue-burden analysis required by the statute, or First Amendment protections. If the government is in fact incapable of narrowing a search to exclude irrelevant records—which is unlikely to be the case—the proper response would be to quash the government's order, not to bless it, given the overbreadth and First Amendment concerns. *See In re Subpoena Duces Tecum to AOL*, 550 F. Supp. 2d at 612 (finding that the "subpoena *must* be

---

[17]    After Judge Buchanan ruled in Warner Media's favor, even while considering two *ex parte*, classified submissions from the government (the original § 2703(d) application and an addendum to the government's opposition to Warner Media's motion to quash), the government submitted *yet another ex parte*, classified submission in conjunction with its motion for reconsideration. Judge Buchanan granted the government's motion for reconsideration based on that third submission. *See* Oct. 26, 2020 Hr'g Tr. 7:17-19 ("I am convinced by the government's confidential submission to me that there is no good way to now narrow this further."). Warner Media has been unable to review or respond to the facts and/or arguments presented in the government's *ex parte* filings. Courts have recognized that such one-sided presentations have the potential to distort the judicial decision-making process. See *United States v. Napue*, 834 F.2d 1311, 1318-1319 (7th Cir. 1987) (explaining that "[e]ven where the government acts in good faith and diligently attempts to present information fairly during an *ex parte* proceeding, the government's information is likely to be less reliable and the court's ultimate findings less accurate than if the defendant had been permitted to participate"). Nonetheless, Warner Media has endeavored to provide the government and the Court with alternatives to narrow the July 15 Order and has explained why, if that is not possible, the order should be quashed.

quashed because it imposes an undue burden" by "not limit[ing] the emails requested to those containing subject matter relevant to the underlying action" (emphasis added)).

Moreover, although Judge Buchanan stated that the government could not narrow its request, *see* Oct. 26, 2020 Hr'g Tr. 7:18-19, there appear to be several ways in which the government could narrow the July 15 Order. For example, beyond additional temporal limitations, the Court could exclude the 26,000 communications that are wholly internal to CNN and Warner Media. The Court could also narrow the July 15 Order to specific email addresses or domains that are known to relate to the government's investigation. Further, concerns that the government would have to reveal details about its investigation to impose such limits could be addressed through a protective order. Courts routinely employ such orders to prevent parties from disclosing information about government investigations.[18] With a protective order in place, cleared counsel could review the information sought by the July 15 Order using additional criteria provided by the government and exclude information unrelated to the government's investigation. Additionally, or as an alternative, the Court could appoint a special master to review the requested information for relevance in light of the weighty First Amendment concerns that are present. Thus, by employing a protective order or a third-party reviewer, the Court can—without jeopardizing the government's investigation—prevent the disclosure of information having no relation to the government's investigation while also protecting vital First

---

[18]    *See United States v. Foggo*, No. 1:08-cr-79 (JCC), 2008 WL 2388282, at *2-3 (E.D. Va. June 9, 2008) (entering protective order to prevent the defendant from disclosing classified information obtained during litigation); *United States v. Smith*, 985 F. Supp. 2d 506, 531 (S.D.N.Y. 2013) (entering protective order to prevent the "public disclosure of some [discovery] materials [that] plausibly could undermine [the government's ongoing] investigations"); *see also United States v. Wolf*, 860 F.3d 175, 187 (4th Cir. 2017) (recognizing the government can disclose confidential information related to a grand jury investigation pursuant to a protective order).

Amendment interests related to newsgathering and reporting activities. Warner Media is prepared (and has attempted) to negotiate with the government to identify and produce relevant information while protecting those serious First Amendment interests. Yet the government to date has refused to consider *any* limitations to the July 15 Order that would minimize the burden on protected First Amendment activities.

Finally, the Magistrate Judge erred as a matter of law in her approach to the statute's "undue burden" standard when she concluded that the July 15 Order was not burdensome because the records were "something that an IT person can easily pull up." Oct. 26, 2020 Hr'g Tr. 8:2-3. As explained above, the undue burden analysis is not limited to logistical burdens. A burden is necessarily "undue" if the government attempts to compel the production of information that is unrelated to the underlying investigation, particularly if it implicates First Amendment protected information. *See supra* at 15-16 & nn.12-13. By departing from that proper approach under the statute, the Magistrate Judge's decision would allow the government to compel the production of records protected by the First Amendment that are not relevant and material to its investigation as long as producing them would not impose a logistical burden on the target of the § 2703(d) order. The First Amendment and § 2703(d) do not condone that result.

**CONCLUSION**

For the foregoing reasons, the Court should quash or narrow the July 15 Order issued pursuant to 18 U.S.C. § 2703(d) or, alternatively, direct the government to narrow the scope of the records sought by the July 15 Order to reach only records that are relevant to its investigation.

Dated: November 9, 2020

Respectfully submitted,

Brittany Amadi (VA Bar No. 80078)
Jamie S. Gorelick (DC Bar No. 913384)
  (*pro hac vice* application pending)
Paul R.Q. Wolfson (DC Bar No. 414759)
  (*pro hac vice*)
Aaron Zebley (DC Bar No. 1023653)
  (*pro hac vice*)
Whitney D. Russell (DC Bar No. 987238)
  (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363
brittany.amadi@wilmerhale.com
jamie.gorelick@wilmerhale.com
paul.wolfson@wilmerhale.com
aaron.zebley@wilmerhale.com
whitney.russell@wilmerhale.com

*Counsel for Warner Media LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of November, 2020, I filed the foregoing with the Clerk of the Court by hand and caused a true and correct copy of this under seal filing to be served on the following:

Gordon D. Kromberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
gordon.kromberg@usdoj.gov

*Attorney for the United States*

Whitney Russell (DC Bar No. 987238)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Warner Media LLC*