IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

*EX PARTE* and UNDER SEAL

IN RE: APPLICATION OF THE UNITED  )
STATES OF AMERICA FOR ORDER       )   Case No. 1:20-dm-12
PURSUANT TO 18 U.S.C. § 2703(d)   )

### THIRD *EX PARTE* AND UNDER SEAL DECLARATION

I, Steven S. Jett, on this 15th day of January 2021, declare and state:

1. I was the declarant on *ex parte* and under seal declarations that were made in the above-captioned case on September 23, 2020 and October 8, 2020. I incorporate here the information and representations set forth in those declarations, including the statements about my background and qualifications.

2. On December 16, 2020, the Court ruled the 2703 (d) Order "... is modified and limited to the requested production of non-content information sent or received from the email account Barbara.Starr@turner.com from government or military email addresses ..." (the "December 16 Order"). I make this third *ex parte* and under seal declaration for the purpose of explaining why the limitation of that production is harming the investigation, and why the investigation needs access to information regarding other "external" emails.[1]

3. On December 30, 2020, the government received a production from Warner Media complying with the Court's December 16 Order. As explained in more detail in my

---

[1] External Emails include all non-content user activity information between the account Barbara.Starr@turner.com and email accounts of individuals not employed by Warner Media or CNN. Specifically, External Emails includes email chains where at least one person in a message's address line is not employed by Warner Media or CNN.

October 8, 2020 declaration, Starr published multiple articles containing classified information over the period for which the 2703(d) order requests records, and a number of other are on related topics, but this investigation has focused most on one particular article. So far, I have been able to review the information provided for the 48-hour period surrounding one of the disclosures at issue in that article. Based on that review, it is clear to me that, without access to all "external" emails that are responsive to the 2703(d) order as initially issued, the government will not be able to further its investigation into the source of the leak.

4. The information contained in the production of December 30, 2020, reveals that Barbara Starr's primary contacts with official government email accounts during the 48-hour period that I have reviewed so far almost exclusively were with members of public affairs offices associated with the military and Capitol Hill. Moreover, aside from one instance in which a Congressional spokesman emailed Starr directly, the contacts with Capitol Hill consisted of mailing lists from Congressional Communications Directors and Press Offices. This is consistent with regular business contacts within the normal course of business. Neither group comfortably could be characterized with the attribution of "administration official" used in the predicating article, nor as members or staffers on Capitol Hill. While administration officials sometimes are found within military public affairs cadre, it has been my experience that they are exceptionally rare.

5. I do not have a firm understanding of how Barbara Starr defines an administration official and it is true that those officials, who could be characterized as such, are located throughout the government. Based on my training and experience, however, I believe that it is most logical to assume that sources characterized as "administration officials" are located somewhere on The White House compound. For example, on the same day as the predicating

2

article, Starr published another article also citing "administration officials" who provided statements that, in my estimation, supported a White House point of view regarding the deliberations with the Pentagon over the new strategy in Afghanistan.

6. Moreover, given the nature of the job, many former Pentagon officials end up as military-policy advisors at the National Security Council (NSC), and vice versa. Based on my training and experience, as well as many of the interviews that I conducted of government officials at the Pentagon and at NSC, I believe, given the length of Starr's career at the Pentagon, she would maintain sources at NSC who previously were recruited by her at the Pentagon. Indeed, in the course of this investigation, a military public affairs official stated to me that Starr "often calls across the river at NSC" and that she once stated to him that not all her sources were at the Pentagon. After a search of the entire December 30, 2020 production provided by WarnerMedia for "@whitehouse.gov" I received no hits.[2] The same search for "@eop.gov" revealed only three hits, two of which were from Pentagon mailing lists where the @eop.gov address appeared on the To line along with many others, including Barbara Starr, and one from another mailing list from @vfw.org, where the @eop.gov address appeared on the CC line.

7. In the course of investigating the possibility that the two administration officials cited in the predicating article could be located at The White House compound, I learned of three desk phones inside the CNN Pentagon Press Booth, one belonging to the government, and two belonging to CNN. The Defense Information Systems Agency (DISA) informed me there were

---

[2] During the course of this investigation, I learned that a former government employee disclosed classified information to a journalist using his government account. That government employee was a senior public affairs official assigned to Defense Press Operations, where reporter Barbara Starr is embedded as the senior CNN Pentagon Correspondent. That former government employee left government service, however, before the occurrence of the unlawful disclosure that is the subject of this investigation.

3

no records of calls on the government-owned desk phone located in the press booth. While I was able to obtain toll records from the CNN-owned phones, I received records reflecting only calls incoming to the press booth. All calls made from the press booth are routed through a trunk line at the CNN Washington Bureau.

8. Based on my experience, I know that cellular service at the Pentagon is problematic and most employees there, if they wish to use their cellular device, have to find a window, enter the courtyard, or leave the building. Even so, I also obtained toll records for Barbara Starr's personal and business cell phones. In order to prove or disprove the theory that the source was a White House official, I needed to obtain and to review the production of Starr's business email. I cannot resolve this theory if I am left only with transactional records sent or received from government accounts, which are, as noted below, not likely to be used.

9. While I share the Court's view that it is most likely that those who commit unauthorized disclosures of classified information are those that have the access to such information, to wit, government and/or military officials, based on the information provided to me, as well as my own training and experience, I submit that it is far more likely that such individuals would elect to commit those disclosures using personal or otherwise non-government accounts rather than government accounts.

10. In preparation for this declaration, I have been provided a list of criminal prosecutions within the last decade regarding unauthorized disclosures of classified information to journalists or organizations, and have either emailed or spoken with many of the FBI case agents involved. As noted below, in none of these cases did a government employee contact a journalist using his/her government-owned email account.

11. In the matter of the *United States v. Bradley E. Manning., PFC (UCMJ 2010)*, the FBI case agent informed me that Manning did not use his official government email account to disclose classified information and/or communicate with Wikileaks or Julian Assange.

12. In the matter of the *United States v. Jeffrey Alexander Sterling (E.D. Va. 1:10-cr-00485-LMB)*, the FBI case agent informed me that she obtained information from Sterling's CIA colleagues that Sterling had bragged about being a confidential source for an article written in 2001, while employed by the CIA, but she found no evidence that Sterling had used his government email account to communicate with the journalist. By the time of their later communications - - for which he was prosecuted - - Sterling already had been fired from the CIA, and used several email addresses and phone numbers to communicate with the journalist on over 40 occasions.

13. In the matter of the *United States v. Daniel Everette Hale (E.D. Va. 1:19-cr-00059)*, the FBI case agent informed me Hale did not use his government email account to communicate with journalists. In fact, Hale established a personal electronic communications account specifically to communicate with the respective reporter.

14. In the matter of the *United States v. Henry Kyle Frese (E.D. Va. 1:19-cr-00304-LMB)*, the FBI case agent informed me that Frese did not use his government email account to transmit classified information with the respective journalists. Instead, Frese primarily disclosed information during in-person meetings or over the phone, which were signaled by a Google chat feature or text.

15. In the matter of the *United States v. Reality Winner (S.D. Ga. 1:17-cr-00034-JRH-BKE)*, the FBI case agent informed me that, while Winner did use a government workstation to contact a podcast associated with a news outlet, she did so from a personal email account. She

also used that same personal email account to contact a different journalist to ask if his show had a secure P.O. Box, where she could send "fan mail." The classified information at issue was sent to a news outlet through regular mail.

16. In the matter of the *United States v. John C. Kiriakou (E.D. Va. 1:12-cr-00127-LMB)*, the FBI case agents informed me Kiriakou did not use a government account to contact a journalist. They told me that Kiriakou simply used his personal email account.

17. In the matter of the *United States v. Shamai Leibowitz (D. Md. 8:09-cr-00632-AW)*, the FBI case agents informed me that Leibowitz communicated with the journalist using his personal email address and his personal telephone.

18. In the matter of the *United States v. Stephen Jin-Woo Kim (D.D.D. 1:10-cr-00225-CKK)*, the FBI case agents informed me that Kim did contact the journalist at issue from his Department of State desk phone. However, that journalist was embedded at the Department of State, in a similar way as Barbara Starr is embedded at the Pentagon, and received the call at his own government-assigned desk phone. In a signed statement, Kim admitted that he then immediately re-contacted the journalist on his mobile phone, and had two short conversations (the first lasting 20 seconds, and the latter lasting 68 seconds). Badging records then showed both exiting the Department of State at nearly the same time, and returning to the building approximately 25 minutes later. In his signed statement, Kim admitted that he disclosed classified information in a face-to-face conversation with the journalist that occurred after he exited the building. The FBI case agents also informed me Kim used two personal email accounts to communicate with the journalist, one of which was an alias account used to communicate with the journalist's alias account.

19. In the matter of the *United States v. Donald Sachtleben (S.D. Ind. 1:13-cr-00200-WTL)*, the FBI case agent informed me that Sachtleben used his personal mobile phone to communicate classified information to the journalist.

20. In the matter of the *United States v. Terry J. Albury (D. Minn. 0:18-cr-00067-WMW)*, the FBI case agent informed me the Government is unaware of how Albury and the journalist first communicated, but has no information to suggest he used a government account. An FBI search of Albury's residence located an SD card, wrapped in a small piece of paper with the journalist's phone number. A camera installed above Albury's desk showed he was taking photos of the screen of his government desktop.

21. Indeed, during my conversations with these FBI case agents regarding prosecutions of government employees disclosing classified information to journalists, I am aware of no instance in which a government employee contacted a journalist using the government employee's government-owned email account. Given the general understanding among government officials about banner authorities that allow monitoring of government officials' computers, I believe it more likely those same officials, particularly those who are not assigned to a public affairs office, would elect to use email accounts not affiliated with the government, as the examples below will highlight. Accordingly, the Court's December 16 Order, which limits production to information related to government-owned email accounts, significantly hinders the government's ability to identify the source of the unlawful disclosure of classified information to Barbara Starr. And, as a result, I respectfully request the Court order Warner Media to produce all External Emails and not limit the investigation to records, sent or received, from government officials' government accounts.

22. The facts and information contained in this Declaration are true and correct according to the best of my knowledge, information, and belief.

Steven S. Jett
Special Agent, FBI