# UNDER SEAL

# TRANSCRIPT

1

1               UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3  IN RE:  APPLICATION OF THE  )  Case 1:20-dm-12
  UNITED STATES OF AMERICA    )
4  FOR ORDER PURSUANT TO      )  Alexandria, Virginia
  18 U.S.C. § 2703(d)       )  December 16, 2020
5                      )  4:04 p.m.
  _____  )  Pages 1 - 26
6

7        TRANSCRIPT OF UNDER SEAL MATTER

8       VIA ZOOMGOV VIDEOCONFERENCE

9    BEFORE THE HONORABLE ANTHONY J. TRENGA

10    UNITED STATES DISTRICT COURT JUDGE

11

12            **ORIGINAL**

13

14

15

16

17

18

19

20

21

22

23

24

25  COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
               UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

1   APPEARANCES:

2   FOR THE GOVERNMENT:

3        GORDON D. KROMBERG, ESQUIRE
         W. NEIL HAMMERSTROM, JR., ESQUIRE
4        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
5        Alexandria, Virginia   22314
         (703) 299-3700
6
         JULIE A. EDELSTEIN, ESQUIRE
7        DAVID H. LIM, ESQUIRE
         U.S. DEPARTMENT OF JUSTICE
8        NATIONAL SECURITY DIVISION
         950 Pennsylvania Avenue, N.W.
9        Washington, D.C.   20530
         (202) 514-2007
10
     FOR WARNER MEDIA, LLC:
11
         PAUL R.Q. WOLFSON, ESQUIRE
12       AARON ZEBLEY, ESQUIRE
         WHITNEY D. RUSSELL, ESQUIRE
13       DEREK A. WOODMAN, ESQUIRE
         KEVIN GALLAGHER, ESQUIRE
14       WILMERHALE, LLP
         1875 Pennsylvania Avenue, N.W.
15       Washington, D.C.   20006
         (202) 663-6000
16

17

18

19

20

21

22

23

24

25

UNDER SEAL

1            THE COURT:  All right.  This matter is under

2    seal.

3            Please call the case.

4            THE CLERK:  No. 1:20-dm-12, *Sealed v. Sealed.*

5            Counsel, will you please note your

6    appearances for the record.

7            MR. WOLFSON:  Good afternoon, Your Honor.

8    This is Paul Wolfson from Warner Media.  With us today

9    on the line are Aaron Zebley, Whitney Russell, Derek

10   Woodman, and Kevin Gallagher, also from my law firm.

11   Also, David Vigilante, the general counsel for CNN, and

12   Zazi Pope and Andrew Han, also from Warner Media.

13           THE COURT:  All right.  Welcome to everyone.

14           MR. KROMBERG:  Good afternoon, Your Honor.

15   Gordon Kromberg for the United States.  With me are

16   Neil Hammerstrom from the United States Attorney's

17   office; David Lim and Julie Edelstein from the

18   Department of Justice, the National Security Division;

19   and FBI Special Agent Steve Jett.

20           THE COURT:  All right.  We're here on Warner

21   Media's objections to an appeal from the magistrate

22   judge's denial of a motion to quash or modify order

23   issued pursuant to 18 U.S.C. § 2703(d).  I've reviewed

24   the supplemental briefing, as well as the proceedings

25   before the magistrate judge.  I'm pleased to hear

1   further from counsel.

2           It's the inherent nature of these proceedings

3   that is really inherently unsatisfying since the movant

4   here, Warner Media, has not had the opportunity to

5   review what the Court has reviewed, which is the

6   *ex parte* classified submissions and the rationale for

7   the order.   The Court has recognized that.   The Court

8   has reviewed Warner Media's overall position and has

9   taken that position into consideration as it has

10  reviewed those *ex parte* classified submissions.

11          Mr. Wolfson, are you going to be speaking on

12  behalf of Warner Media?

13          MR. WOLFSON:   Yes, Your Honor.

14          THE COURT:   All right.   I'll give you that

15  opportunity.

16          MR. WOLFSON:   Thank you, Your Honor.

17          I'd like to start by addressing sort of two

18  salient features about this case.   The first is this is

19  not a run-of-the-mill 2703(d) order.   This case

20  involves an order that is directed at a journalist's

21  e-mail account and forces the journalist -- would force

22  the journalist to disclose every contact she had by

23  e-mail over a two-month period, whether internal or

24  external.

25          According to the government, there's nothing

1  problematic under either the First Amendment or
2  Section 2703 in forcing a journalist to turn over a
3  road map of all of her news-gathering activities and
4  all of the newsroom's sort of editorial -- even if they
5  have no connection to the government's investigation.

6          No case suggests that the government can
7  simply scoop up everything that a journalist does in
8  this manner.  To the contrary, the Supreme Court, the
9  Fourth Circuit, and other courts have all made clear
10 that the government has to tread very carefully when
11 First Amendment interests are at stake.

12         Let me address the second important aspect
13 here, which is Warner Media is not asking the Court for
14 an evidentiary privilege.  An evidentiary privilege
15 applies where courts -- where a witness can refuse to
16 testify and refuse to hand over even relevant
17 information concerning a crime.  That's the argument
18 that the Supreme Court rejected in *Branzburg* and that
19 the Fourth Circuit rejected in *Sterling*.

20         We're not arguing that the government is not
21 entitled to relevant information in the investigation.
22 What we are arguing is that in light of the First
23 Amendment interests at stake, when the government uses
24 compulsory process to obtain information directly from
25 a news organization and from a journalist, it has to

UNDER SEAL

1 carefully distinguish between irrelevant information
2 and relevant information.  And it has not done so here.
3        Even in other circumstances, the government
4 could paint with a broader brush under 2703.  Given the
5 First Amendment interests at stake, it may not do so,
6 and it has to take a more tailored approach.  In a case
7 like this, the government has to take a narrower more
8 targeted approach before it seizes information about a
9 journalist's contacts.
10        Even assuming that some portion -- some small
11 portion of these 34,000 e-mails are relevant, still,
12 Your Honor, it cannot be that every name of every
13 contact for every news story that a journalist had over
14 two months is relevant to the government's
15 investigation.  During the two months covered by the
16 order, Ms. Starr published more than 50 articles and
17 appeared on camera 150 times covering topics literally
18 spanning the globe from Afghanistan to North Korea to
19 internal politicking at the Pentagon.
20        For all of these articles, she constantly
21 worked her beat developing her sources and contacts and
22 communicating internally at CNN.  Even the government
23 has never suggested that all of her reporting and all
24 of her stories bear on the government's investigation.
25        There's also the problem of the 26,000

1   e-mails that are internal to CNN and Warner Media.  It

2   cannot be that every contact that the reporter had with

3   her editors and colleagues over a two-month period is

4   relevant to the government's investigation.

5            In fact, even assuming that this is a leak

6   investigation, as the government has suggested, it's

7   hard to see how any of the internal e-mails would be

8   relevant to the investigation.  None of them would

9   disclose -- would be likely to disclose the identity of

10  her sources.  But even assuming some of them might be,

11  it cannot be the case, Your Honor, that all of these

12  contacts that are internal to CNN would be relevant to

13  the government's investigation.

14           But they would do damage to the First

15  Amendment interests at stake.  Because what they would

16  do is give the government essentially a bird's-eye view

17  of how the newsroom operates, what its journalistic

18  priorities are.  And what is particularly troubling,

19  given what this reporter's beat is, is it would allow

20  the government essentially to monitor -- to peer over

21  the shoulder of a news organization that is

22  investigating the government itself.

23           I'm not aware of any authority that says that

24  the government can breach the wall into the newsroom

25  and essentially say, "Tell us every contact that you,

1 the reporter, had with all of your colleagues and all
2 of your editors over a two-month period."
3          As the Fourth Circuit said in *The Washington*
4 *Post* case which is cited in our briefs, the integrity
5 of the newsroom does not really permit mandated
6 interactions with the government.
7          Our point, again, is not that the government
8 may never obtain information from a news organization,
9 but Section 2703 and the First Amendment do not give
10 the government the right to essentially rummage through
11 all a journalist's contacts.
12          Now, the government points out that Judge
13 Davis issued the order based on the affidavit that was
14 submitted to him, but the government at the time and
15 Judge Davis at the time did not know how capacious the
16 order would be.  We presume the government and Judge
17 Davis did not know that the order would reach many
18 thousands of purely internal communications and
19 thousands of external communications having nothing to
20 do with the government's investigation.  Now that the
21 government does know that, it is obligated to take a
22 more tailored approach.
23          Now, the government suggests that there are
24 no First Amendment interests at stake because the
25 2703(d) order here only asks for noncontent records,

1  but no court has endorsed the proposition that just
2  because a record is noncontent means that it has no
3  First Amendment protection.  And I think that follows,
4  you know, from a ready understanding about how
5  journalists operate.  If the government knows who all
6  of a journalist's contacts are and all of a
7  journalist's sources are, then the government can learn
8  what that reporter is investigating.

9           And the internal information also lets the
10 government know what the newsroom's priorities are.
11 That's a critical First Amendment interest.  Again, the
12 question is not whether the government might be able to
13 obtain relevant information about one of the reporter's
14 sources who had information about a crime.  That's what
15 was at issue in *Branzburg* and *Sterling*.  In *Branzburg*
16 and *Sterling*, what was at issue was that the government
17 was attempting to get the testimony of journalists who
18 had themselves seen criminal activity or who had
19 information, who knew that people had essentially
20 confessed to criminal activity or had directly relevant
21 activity.

22          They were very, very targeted approaches.  I
23 mean, in *Sterling*, the government essentially was
24 asking the reporter to testify about one thing, that he
25 got his information from one particular source.  The

1  government was certainly not attempting to say to a
2  journalist, "Please give us the identities of everybody
3  who you spoke to over a two-month period even if that
4  has nothing to do whatsoever with our leak
5  investigation."  That is essentially what the
6  government is doing now.

7        I think there are many questions that the
8  government should ask itself before, you know, engaging
9  on such a broad-brush approach and why -- and how the
10 government should tailor its request.  For example, why
11 are the purely internal communications necessary at
12 this juncture?  Why can't the government go
13 step-by-step and seek the external ones first and then
14 the internal ones as another option?  Why can't the
15 government limit its searches to certain e-mail
16 domains?

17        For example, why can't the government exclude
18 some?  For example, some of the communications may be
19 from people with .gov and .mil e-mail addresses.  Those
20 are e-mail addresses to which the government itself has
21 access without needing to go to a journalist, as it's
22 not supposed to do under the Department of Justice
23 media regulations which do recognize the important
24 First Amendment interests at stake.

25        You know, given how many stories Ms. Starr

1 investigated, why can't the government at least exclude

2 a number of them because it knows that they're

3 irrelevant to the investigation?

4       Also, Warner Media has attorneys, outside

5 attorneys who are cleared, you know.  Why can't the

6 government work with cleared counsel and help them

7 refine the investigation?

8       I think all of those -- all of those are

9 options that the government could have considered and

10 should have considered without going -- without

11 essentially taking this very, very broad approach and

12 asking for every single thing -- every single e-mail

13 that a journalist has had with her contacts over a

14 two-month period, the vast majority of which are surely

15 not relevant to its investigation.

16       I think I've made my main point here, Your

17 Honor.  Again, I want to emphasize we are not asking

18 here for an evidentiary privilege.  We are not saying

19 that a journalist is entitled not to turn over

20 information that the government can show is relevant to

21 a criminal investigation.

22       What we are saying is that, given the scope

23 of this order, the vast majority of the information is

24 almost certainly irrelevant.  And when the

25 government -- when the 2703(d) order has such a broad

1    reach, the government must proceed more carefully and

2    in a more tailored fashion to filter out the relevant

3    from the irrelevant information and, the government has

4    not even tried to do that here.

5           Thank you.

6           THE COURT:  All right.  Thank you.

7           Mr. Kromberg, are you going to be arguing or

8    Mr. Lim?

9           Mr. Kromberg, you need to unmute.

10          MR. KROMBERG:  Thank you, Your Honor.

11          The fundamental misconception here, as Your

12   Honor noted, is that Warner Media just doesn't know

13   what it doesn't know.  And when Warner Media comes and

14   argues that we should have tread more carefully, we

15   should have followed the DOJ regulations, Your Honor

16   knows from the *ex parte* portions of the filings here

17   that we tread very carefully here and we did our best.

18   We followed the DOJ regulations, and here we are today.

19          We're at sort of an ironic position in

20   that -- we're not hearing Warner Media say, oh, just --

21   we'll be glad to tell you who the source is that you're

22   looking for.  They're not saying that because they know

23   that under *Sterling*, there's no way that they could not

24   tell us that if we asked.  They don't have a legal

25   privilege to not tell us that.

1        So in our attempt to tread more carefully and
2  not ask directly who the source is, we tried to do it a
3  different way, and we tried -- as Your Honor can see
4  from the pleadings, the *ex parte* pleadings, we tried in
5  many ways to determine the information at stake here.
6  And after thinking about it and thinking about it and
7  thinking about it, we are where we are, and that's --
8        When Warner Media says it cannot be that
9  every contact is relevant, Warner Media just doesn't
10  know what they don't know.  When Warner Media says they
11  haven't narrowed -- they haven't volunteered a solution
12  to a more narrow search, when they say we haven't
13  figured out a way to do a more narrow search, it's
14  because they don't know what they don't know.  We have
15  tread carefully.
16        The First Amendment is not as Warner Media
17  concedes.  It does not protect this information.  We
18  need the information for the reasons that the Court has
19  seen.  2703(d) does not provide a defense for what
20  impinges on some First Amendment right here, which
21  Warner Media concedes that it's not a First Amendment
22  right to withhold it.  It's not a matter of burden
23  under the terms of 2703.
24        The issue of -- Warner Media suggests a
25  step-by-step -- well, we haven't followed a

UNDER SEAL

1    step-by-step process.  We haven't proposed that.  Here

2    it is in December 2020.  We're looking for information

3    for a period in 2017.  The process that we followed up

4    to now, as the Court can see from the *ex parte* filings,

5    has been deliberative, has been deliberate, methodical,

6    and we have gone down many avenues, and here we are

7    almost three-and-a-half years later.

8           In a step-by-step process, one of the risk is

9    that information and evidence will disappear over time.

10   Memories fail too, but also, information fails over

11   time.  I haven't heard Warner Media saying that they

12   are taking action to preserve all the information that

13   exists.  I certainly hope that they have.

14           But the point is if we did a step-by-step

15   process, I think for the reasons that were specified in

16   the *ex parte* filings, it wouldn't work.  And the FBI

17   would not be able to proceed with its investigation

18   because it would need all of the pieces in order to

19   figure out which are the key ones.  But even if that

20   were possible, to work with only some of the pieces

21   first, we are also risking the evidence disappears as

22   time goes by.

23           So, Judge, I ask that for the reasons set

24   forth -- I think the answers to the questions that

25   Warner Media raises are -- those answers are contained

UNDER SEAL

1  in Special Agent Jett's declarations, and I ask that

2  the reasons for those -- that's the factual basis for

3  our request.  The legal basis is there's no First

4  Amendment privilege here.  There's no provision under

5  2703 for quashing or limiting the order on the grounds

6  that Warner Media has raised.  Therefore, we ask that

7  you uphold the determination and ruling of Judge

8  Buchanan below.

9          Thank you.

10         THE COURT:  Mr. Wolfson.

11         MR. WOLFSON:  Yeah, Your Honor.  Thank you.

12  I just want to make a few brief points.

13         First of all, Warner Media will preserve the

14  information that is called for by the 2703(d) order and

15  has done so.

16         Secondly, you know, my friend on the other

17  side says, you know, that this was a very deliberate

18  process, but the problem is the -- as I said, we're

19  willing to assume that the government didn't know when

20  Judge Davis issued the order that the 2703(d) order

21  would reach as broadly as it did.  But the government

22  now has that information, and it now knows that the

23  order reaches vastly beyond what must be material and

24  relevant to -- relevant and material to its

25  investigation.

1    That's the problem here.  The problem is, you

2  know, even if the government went into it not intending

3  to do so, now it is nonetheless -- the First Amendment

4  does not entitle it just to scoop up all a reporter's

5  contacts.

6    If the government said to a reporter,

7  "Please, you must give me all of your contacts,

8  everybody you contacted over a two-month period, over

9  all of your -- all of your stories no matter how

10  irrelevant to what we're investigating," I don't think

11  any -- it's inconceivable that that would be upheld

12  under the First Amendment.  But that's essentially what

13  the government is saying it's entitled to here.

14    It the same thing with going sort of internal

15  to a newsroom.  If the government said to a reporter,

16  "You must tell us the names -- the names and times of

17  every single person you contacted within your newsroom,

18  including all of your editors," so then the government

19  would have a road map of basically when -- you know,

20  when they spoke with whom.  Again, that's very, very --

21  that's really kind of the crown jewels of what a

22  newsroom has under the First Amendment, and that's

23  very -- that's sort of at the core, I think, of what

24  the First Amendment protects.  Because, essentially, it

25  would let the government know what the newsroom is

1  going to investigate about the government.

2  Essentially, that's the government saying there's no

3  First Amendment problem.

4          I'm not aware of any case that would suggest

5  that.  Certainly, there are cases like *Branzburg* and

6  *Sterling* that say when the government is looking and is

7  investigating a crime, is looking for specific

8  information from a journalist because the journalist

9  has either saw that crime or has information relevant

10 to it, that the journalist does not have a First

11 Amendment privilege to say to the government, "You

12 can't ask me that question."

13         It's important to be very precise about what

14 *Branzburg* and *Sterling* held.  *Branzburg* and *Sterling*

15 held that there is no First Amendment privilege to

16 refuse to answer relevant questions relevant to a

17 crime.  That's not the concern we have here.  The

18 concern we have here is that the compulsory process

19 directed at a journalist here reaches far, far beyond

20 what's relevant, and that is where the First Amendment

21 requires a more discriminating approach.

22         Thank you.

23         THE COURT:  All right.  Thank you.

24         The Court is going to take a short recess,

25 and then I'll come back.  If you all will just stay

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

```
 1   with me --
 2           MR. KROMBERG:   Your Honor --
 3           THE COURT:   Yes.
 4           MR. KROMBERG:   -- can I impose?   I would like
 5   to add something.   It's not actually in response to
 6   what Mr. Wolfson said.
 7           THE COURT:   Go ahead.
 8           MR. KROMBERG:   Thank you, Your Honor.
 9           I apologize to Mr. Wolfson.
10           One of the problems in this case is we know
11   that the wheels of justice grind slowly and exceedingly
12   fine.   One of the problems with this particular
13   investigation is that it's not just the matter of
14   achieving justice in a criminal case, but the danger
15   that was -- the issue that is causing the investigation
16   is -- we're interested in terminating that danger as
17   well.   And the longer the investigation continues, the
18   longer the danger remains undealt with, not dealt with.
19   So I do ask that the Court consider that time is
20   significant in this case not only because of the
21   possible loss of evidence, but also because of the harm
22   that triggered the investigation is ongoing.
23           Thank you.
24           THE COURT:   Mr. Wolfson, I'll give you an
25   opportunity to respond if you'd like.
```

1          MR. WOLFSON:  Oh, thank you, Your Honor.

2          Just briefly, you know, we understand that

3   concern, but the government -- if the government takes

4   a narrower approach, it can get records faster.  I

5   mean, our concern here is with the scope of the order.

6          THE COURT:  All right.  The Court is going to

7   take a short recess.

8          (Recess from 4:26 p.m. until 4:38 p.m.)

9          THE COURT:  We're still under seal.

10          The Court has reviewed this matter, which is

11   before the Court on Warner Media's objections to an

12   appeal from the magistrate judge's denial of motion to

13   quash or modify order issued pursuant to 18 U.S.C. §

14   2703(d).  In that order, Magistrate Judge Buchanan

15   ordered Warner Media to produce to the government

16   information concerning all e-mails that one of its

17   national security reporters working for CNN sent or

18   received during the two-month period June 1, 2017,

19   through July 31, 2017.

20          On July 17, 2020, Warner Media was served

21   with an order dated July 15, 2020, issued under 18

22   U.S.C. § 2703(d).  That order required Warner Media to

23   produce records and other information relating to the

24   e-mail account barbara.starr@turner.com for the period

25   of June 1, 2017, to July 31, 2017.  The July 15 order

UNDER SEAL

1   directs production of extensive information about that

2   account, as well as information about communications

3   sent and received from that account during that period.

4   Overall, the order would require the production of

5   approximately 34,000 e-mails pertaining to that

6   account.

7        On September 11, Warner Media filed a motion

8   requesting the Court to quash or narrow the July 15

9   order.  The government opposed that motion and

10  submitted an *ex parte* classified declaration.

11       At a hearing on October 7, 2020, Judge

12  Buchanan concluded that the government had not

13  sufficiently narrowed the request for records from the

14  barbara.starr account to obtain relevant records and

15  ordered the government to submit a proposal to narrow

16  its request.

17       On October 9, 2020, the government filed a

18  motion with Judge Buchanan requesting reconsideration

19  and filed a supplemental classified *ex parte* submission

20  in support of that motion.

21       On October 26, Judge Buchanan granted the

22  motion for reconsideration and ordered Warner Media to

23  comply with the July 15 order by November 2.  In

24  granting the government's motion, Judge Buchanan

25  concluded, based on the government's *ex parte*

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

1  submissions, that the order could not be further
2  narrowed and that the order was not unduly burdensome
3  administratively.
4         On November 9, Warner Media filed its
5  objections and appeal from that order.
6         The first issue to be addressed is the
7  standard of review of Judge Buchanan's order.  In that
8  regard, the government contends that the standard of
9  review is a clearly erroneous or contrary-to-law
10  standard while Warner Media contends that *de novo*
11  review is the appropriate standard.
12         Based on the Fourth Circuit's decision in *In*
13  *re Application of the United States*, 707 F.3d 283 --
14  and the case is cited at 289 -- the Court concludes
15  that the appropriate standard of review is *de novo*
16  review since the order under review was issued by a
17  magistrate judge engaged in additional duties under 28
18  U.S.C. § 636(b)(3) of The Federal Magistrates Act.
19         The Court has, therefore, considered *de novo*
20  the July 15 order and Warner Media's motion to modify
21  or quash the order.
22         All of the ordered information requested
23  falls within the category of noncontent records under
24  the Stored Communications Act.  Under that act, a court
25  may grant a government's records request under

UNDER SEAL

1  Section 2703(d) upon the government's showing of

2  specific and articulable facts showing that there are

3  reasonable grounds to believe the records or other

4  information sought are relevant and material to an

5  ongoing criminal investigation.

6       The act also provides that a court may quash

7  or modify a Section 2703(d) order if the information or

8  records requested are unusually voluminous in nature or

9  compliance with such order otherwise would cause an

10  undue burden on such a provider.

11       Warner Media has requested such relief both

12  on the grounds that the order was overbroad and will

13  likely include a large number of e-mails having no

14  connection to the government's investigation,

15  particularly the internal e-mails to be produced since

16  during the relevant period the reporter wrote more than

17  50 news articles, appeared on television and radio in

18  her professional capacity on more than 150 occasions,

19  and the articles cover a wide range of topics.

20       Warner Media also emphasized that the order

21  implicates substantial First Amendment issues,

22  particularly the production of internal e-mails, which

23  goes to the core of news gathering and editorial

24  functions.

25       The Court has reviewed the government's

1  *ex parte* classified submissions, and it's considered

2  the reasons for the scope of its requested order in

3  light of those submissions.  Based on that *de novo*

4  review, the Court concludes that with respect to the

5  externally sent or received e-mails, the government has

6  made the required showing with respect to government

7  and military e-mail addresses but not otherwise.

8         The Court also concludes with respect to the

9  government and military e-mail addresses that the order

10  does not impose an undue burden on Warner Media either

11  from an administrative perspective or a constitutional

12  First Amendment perspective.

13         With respect to the requested internal

14  e-mails, the Court has reviewed the government's

15  explanation for why there are reasonable grounds to

16  believe the records in this category are relevant and

17  material to an ongoing investigation.  But based on the

18  Court's review, the Court has to conclude that the

19  theory of relevancy upon which this request is made is

20  not based on sufficient specific and articulable facts,

21  but rather more on speculative predictions,

22  assumptions, and scenarios unanchored in any facts.

23  Overall, the requested information by its nature is too

24  attenuated and not sufficiently connected to any

25  evidence relevant, material, or useful to the

UNDER SEAL

1   government's ascribed investigation, particularly when

2   considered in light of the First Amendment activities

3   that it relates to.

4           So for these reasons, Warner Media's motion

5   to modify or quash the July 15 order is granted in part

6   and denied in part.  It is granted to the extent that

7   the order is limited to production of the requested

8   noncontent information pertaining to the external

9   e-mails sent or received from the barbara.starr@turner

10  account from government or military e-mail addresses,

11  and it is otherwise denied.  But this denial is

12  specifically without prejudice to the government's

13  renewal of these broader requests based on information

14  it may obtain from the ordered production or otherwise.

15          The Court will issue that order.

16          Is there anything further on this?

17          Mr. Wolfson, are you trying to speak?

18          MR. WOLFSON:  I'm sorry, Your Honor.  I'm

19  just conferring with my colleagues here.  Obviously, we

20  need some time to review the Court's order for which I

21  thank you.  Would we -- given that Your Honor has

22  upheld the government's 2703(d) order in part, I'd like

23  to move for a stay of obligation to comply with that

24  part so that we can consider whatever our appellate

25  options may be for 14 days.

1          THE COURT:  All right.  Mr. Kromberg, do you
2   want to say anything about that?
3          MR. KROMBERG:  Your Honor, I think that at
4   least with respect to what Your Honor ordered, it's
5   hard to imagine there's a likelihood of success on the
6   merits.  So I oppose the motion to stay.
7          THE COURT:  Well, given the length of time
8   this has been percolating, I don't think that amount of
9   time, given the issues involved in this case, is
10  unreasonable for them to consider their options.  I'm
11  going to stay the order for 14 days.
12          All right.  Anything further?
13          MR. KROMBERG:  Not from the government, Your
14  Honor.
15          THE COURT:  All right.  Very good.
16          MR. KROMBERG:  I'm sorry.  One other thing.
17          THE COURT:  Yes.
18          MR. KROMBERG:  Warner Media did represent
19  that they would preserve all the information, and I
20  would hope -- well, I ask that Your Honor direct that
21  that, in fact, be done.
22          THE COURT:  The Court will order they
23  preserve all of the requested information.
24          MR. WOLFSON:  We will do that, Your Honor.
25          THE COURT:  Let me just point out.  Really,

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

1  the 14 days, given the holidays, I think is

2  particularly appropriate.

3          All right.  Very good.  The Court will stand

4  in recess.

5          MR. KROMBERG:  Thank you, Your Honor.

6          MR. WOLFSON:  Thank you, Your Honor.

7          ----------------------------------
              Time:  4:46 p.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21          I certify that the foregoing is a true and

22  accurate transcription of my stenographic notes.

23

24

25  Rhonda F. Montgomery, CCR, RPR

UNDER SEAL

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599